of the state of Illinois has now convened the Honorable Justice John W. Turner presiding. Thank you. Good afternoon. We're here on case number 4-2-2-0-6-2-2, people of the state of Illinois, X-Rail, Emily Fox and Jenny Thornley. Would counsel for the appellant please identify yourself for the record? Your Honor, Robert Adleman for the relator, Emily Fox. Thank you. And counsel for the appellee? Yes, this is Assistant Attorney General Richard Hussack for the state. Okay, thank you. Mr. Adleman, you may proceed with your argument. Thank you, Your Honor. And may it please the court, my name is Robert Adleman. I do represent the appellant, Emily Fox. Your Honor, this case raises two fundamental legal questions of first impression in Illinois. The first concerns a key Tam relator's rights under the U.S. Constitution when the state attempts to dismiss her claim over her objection. And the second concerns what is required in the hearing provided for in section 4-C-2 of the Illinois False Claims Act before such a dismissal, specifically where the relator alleges state officials complicity in a fraud against the state. I'd like to begin with the constitutional question because the Constitution sets the minimum requirement for all government conduct of legal truth that, surprisingly, the Attorney General has disputed in this case, arguing at pages 41 and 42 of his brief, that there are no judicially implied substantive limits to his conduct. Of course, not the case. Frankly, it's troubling and indicative of what we consider to be the bad faith here that the Attorney General even makes the argument that his conduct is unconfined by due process because the Supreme Court has been clear, our Supreme Court, Illinois, that the Constitution's that is deemed oppressive, arbitrary, or unreasonable. That's the Wingert case cited in our brief. And the Supreme Court went on to say substantive due process bars government action that infringes upon a protected interest when such action is arbitrary, which is consistent with this court's statements in the Ashcroft v. Board of Education case we also cited. The government's motion in this case is not analogous. The government's motion to dismiss below was not analogous to an exercise of prosecutorial discretion, as the state has argued. In fact, that argument was explicitly rejected by the Seventh Circuit in the UCB case. It's cited in the briefs using the acronym in that case, which is C-I-M-Z-N-H-C-A. Since that's unpronounceable, use the other party. And that's at 970 F-3rd at 851. The court there rejected this position, the same one advanced by the state here, because it rejected the premise that the relator has no cognizable constitutional interest, no property interest in the lawsuit. And the fact is the relator doesn't just sue for the state under the Illinois False Claims Act. She also sues herself. So at 740 I-L-C-S-75-4-B-1, the statute provides that the key TAM action is brought, quote, for the person and the state. Of course, Emily Fox is the person. The Illinois statute is modeled in this regard on the federal and the U.S. Supreme Court 13 years ago in the Vermont Department of Natural Resources case affirmed that relators have a cognizable property interest in their lawsuits. And in fact, the Supreme Court reaffirmed that principle just last month in the Polanski decision. So here, Ms. Fox does have a property interest in this lawsuit, and the Constitution demands that she not be denied that interest arbitrarily. Counsel, I want to read to you Rule 341-H-6, which reads as follows. Statement of facts in a brief shall contain the facts necessary to an understanding of the case stated accurately and fairly. That's what a brief shall include, without argument or counsel or comment rather, and with appropriate references to the pages of the record on appeal. Here are some excerpts from your brief. Fox comments that one, governor's general counsel's participation in phone calls about Thornley's fraudulent claims, quote, was, as Fox alleged, a raw display of political power. Two, without citation to the record, quote, Thornley defrauded the people of the state of Illinois out of more than $500,000, unquote. Three, quote, the OEIG did nothing to investigate Thornley. Instead, the OEIG suffered an unsubstantiated investigation into Fox, apparently based on either Thornley's request or Spillane's direction, unquote. And four, in its boilerplate motion to dismiss, the attorney general ignored the detailed allegations of Fox's complaint, unquote. So my first question is, are these statements in compliance with rule 34186? Your honor, I'd have to find those within the brief. I will say that in our statement of facts in our brief, which is it starts at page five and runs through page 10, every sentence is supported by a reference to the record. And so I, that's not the question I asked. I said, the comments I just read, are these consistent with rule 34186? I believe every factual statement we make in our brief is supported by a record site. Just to give you an example, your honor, you raised the issue. No, this is, you're telling me that these are not just stated accurately, but fairly without argument or comment. Is that your position? Well, I think a brief, of course, includes arguments. Of course it does. It's the statement of facts that needs to be supported. And so, for example, your honor, with regard to the OEIG's refusal to investigate, we cite at page 10 of our brief, record RC21, record C595, 596, record C114, 115. Every single one of the OEIG's refusal to investigate is supported by a specific reference to the record in our brief. Now, your reference to how the governor's general counsel participation in phone calls was a raw display of political power that's consistent with 34186? I don't know where exactly in our brief that you're reading from. If it's from the argument, this is from the statement of facts. Your honor, the fact that the governor's general counsel... Counsel, my question was, is that statement consistent with rule 34186 that requires that facts be stated accurately and fairly without argument or comment? Well, obviously, that's argumentative, your honor. I agree with you on that. I can't find it right now looking at our statement of facts. I didn't make it up, counsel. It's in your brief. Well, I don't doubt that it's in our brief. And I actually think that it is true, that it was a raw display of political power. What should this court do when confronted with a display as here of a clear violation, in my judgment, of the Supreme Court directives in rule 34186 regarding the preparation of a brief? Your honor, I could go through the government statement and find plenty of argument in their factual statement. I think... Counsel, my question was, what should this court do when we find a expedited process of your answer to the question actually asked? Well, obviously, you're entitled to disregard statements that aren't supported by the record. Okay, you may continue. Thank you, your honor. I'd like to speak to what substantive due process requires under the U.S. Constitution. It specifically requires that government conduct not be arbitrary or capricious. And the Attorney General's state focuses on the formulation of that standard is that it must shock the conscience to violate due process. The U.S. Supreme Court has explained what it requires to shock the conscience in this sense. In the Rosales-Morales v. U.S. case, it's 138, Supreme Court, 1897-1906. It says that government conduct shocks the conscience when it does injury to a citizen that is unjustifiable by any government interest or shows deliberate indifference to citizens' interests. And we contend that standard is readily satisfied here where the state actually denies that Ms. Fox has any interest and where it failed to provide any rationale or justification for its conduct. The facts in this case are unique, different from any of the other cases the parties have cited, and they're troubling. So, you know, Jenny Thornley defrauded the state of Illinois out of over a half a million dollars. She obtained her state jobs and multiple raises after lying that she had a college degree that she didn't. She forged signatures to get raises. She forged signatures to be paid for overtime she didn't work. She made up a story about a workplace incident that was disproven, found without evidence, by two investigations by the Illinois State Police and later a private law firm that was paid over a half a million dollars to investigate it. And then she submitted a fraudulent workers' compensation claim based on that same made-up workplace incident. And she did these things after texting the governor's wife saying, J.B. needs to know about this. I thank you for my friendship. The claim that she made, the workers' comp claim, falsely stated that she worked directly for J.B. Pritzker. That was her direct report, and she provided her personal phone number as a contact. But it wasn't submitted through the normal channels. It was submitted directly to the governor's general counsel. That's Anne Spillane. The governor's general counsel became personally involved then in pushing CMS to pay the claim, including pushing it to reverse Thornley's termination by the Illinois State Police Merit Board, which is the independent agency for which she actually worked, despite the fact that Spillane, as the governor's general counsel, clearly knew that the claim was false because she knew she didn't work for the governor's office. She knew that wasn't the process for filing a workers' comp claim. And she knew that Jenny Thornley didn't report directly to J.B. Pritzker. And no explanation has ever been provided for why the governor's general counsel would be involved in directly advancing this claim by this mid-level employee of an independent state agency, other than an exercise of pure political power. And yet, instead of vindicating the state's option, the attorney general has and continues to try to obscure the facts and prevent this case from proceeding. They've never articulated any legitimate state interest in dismissal. Certainly their motion didn't. And in their reply brief below, they offered arguments that were facially pretextual and counterfactual. And I think it's worth discussing those pretextual willing the attorney general was in this case to make arguments that were counterfactual and unsupported by the record. So, for example, they argued, well, the case is barred by some affirmative defenses that Thornley could raise. They said that it could be barred by the public disclosure bar. But if you look at their reply brief, which is the first time they raised it below, they used ellipses to take out the exception to the public disclosure bar for an original source. Not the original source, but an original source. And then if you look at the transcript of the hearing below at pages eight and nine, you'll see the assistant attorney general say, well, there was three ways it was publicly disclosed. Before it was publicly disclosed by this private law firm's investigation, McGuire Woods investigation. But they ignore that Ms. Fox was the source of that investigation, that her name's mentioned 150 times in that report, that she gave 12 hours of testimony or interviews to McGuire Woods. Then they say, well, it was publicly disclosed because Thornley made a fraudulent workers' comp claim, which is an absurd argument that the false claim itself is a disclosure of the false claim. Then they say, well, the OEIG looked at this, but the OEIG wouldn't look at it. And as I noted a record where Ms. Thornley, in fact, actually, if you look at the way the AG argued it below, they said someone raised it with the OEIG without disclosing that it was Ms. Fox who raised it with the OEIG. But then they refused to investigate it. All of this completely counterfactual argument given below. And the other argument they made, of course, was that there was the government action bar, another affirmative defense that Thornley could raise, doesn't have anything to do with the workers' comp claim. It's not in the government's interest, even though that requires there be a civil money action against the defendant to recover these funds. They cited two actions. They cited the workers' comp claim, but then had to admit at the hearing that the government wasn't actually trying to claw back that money, that they hadn't done anything to try to get the money back in that proceeding. And then they cited the criminal case that Ms. Fox actually instigated through her complaints to the state's attorney's office. They wouldn't bring it because they said they had a conflict of interest and a special prosecutor got involved. But that only involves a small fraction of what we're talking about. And it's not a civil money action. It's a small criminal case. Counsel, is it your position that the motion to dismiss involved in this case should be considered by the trial court in this court as if it were a motion to dismiss under Section 2-619? It is. Yes, Your Honor. And that's consistent with the only appellate court decision that we have in Illinois on that subject, the Sirota decision. So with regard to the issue of... About the recent decision of the United States Supreme Court regarding the federal T-10 case and Polanski versus Executive Health Resources, and what the Supreme Court of the United States said about that. Are you familiar with it? I'm very familiar with it, Your Honor. Doesn't that suggest that the standards applicable under Section 2-619 don't apply to the motion to dismiss T-10 procedure? Yeah, I would respectfully disagree with that. Obviously, 2-619 wasn't an issue. That case didn't arise from Illinois. It's a federal case under the federal rules of civil procedure. So on the procedural issue, there is nothing that the federal rules of civil procedure. And so the court analyzed the case under a modified version of Rule 41, which is the voluntary dismissal rule under the federal rules. But in Illinois, we have 2-619, and 2-619A9 provides for dismissals based on an affirmative matter. And again, in the only Illinois case construing our code of civil procedure, the appellate court, I think in the third district, properly held that this is most closely analogous in our procedural rules to 2-619A9. Ultimately, I mean, I would like to talk about Polanski, if Your Honor is interested. I think the decision in Polanski is entirely consistent with Ms. Fox's position in this case, including since right now we're talking about the, I was talking about the constitutional issue. The court is clear, although the constitutional claim wasn't made in Polanski, that at the very minimum, the hearing required before a 4C2 motion to dismiss can be granted requires consideration of the relator's constitutional rights. And that's at footnote four of the opinion, where the U.S. Supreme Court says that that constitutional interest is the bedrock, the minimum that needs to be considered at the hearing. You know, the record in this case is distinguished, as I said, from all the other cases that are cited. In every other case involving a state motion to dismiss, the state articulates a independent interest that is legitimate in why the case should be dismissed. In the Burlington Co. case, the state had taken a position on the nexus to Illinois required for use tax to be imposed that was consistent with the defendant and inconsistent with the relator. And they said, you can't prosecute a false claim in that case. It's inconsistent with the position of the Seventh Circuit. That was the issue, was that it was inconsistent with the government's position, the relator's position was legally. And in Polanski, there is a detailed analysis of the expenses involved for the state or for the government, federal government in that case. There's, you know, hundreds of thousands of Medicare claims that were at issue. There was an issue about labor, the deliberative process privilege. And if you look at page six of the actually examined what the state said, entirely different than what happened in this case, where the position of the circuit court was he wasn't allowed to second guess or question anything that the state had to say about it. You know, there was a hearing necessary in this case, Polanski emphasizes that at that hearing, the relator has interest. In fact, Polanski says that unlike a normal federal motion to dismiss, to voluntarily dismiss, the court has to take into account the relator's interest. And that's at page 15 of the opinion. You know, I know my time's almost up, Your Honors, but you know, there's a there's some policy questions here that overlay the whole case. And that is that when you have allegations like these of high ranking state officials, facilitating a fraud on the state, and a Fox comes forward to expose that corruption, when can or should the state be allowed to throw a blanket over that corruption to prevent it from coming to light? And are the courts really powerless to stop that? And we propose the answer to the first question is that these facts describe exactly why there's key tam litigation in the first place. So that when for whatever reasons the state won't explore or get to the bottom of a fraud, a relator can do it. And courts are not powerless to stop this. This court can and should do so by reversing the circuit court decision to dismiss the complaint. You know, in the end, politically connected operatives like Jenny Thornley should not be allowed to get away with fraud against the state, they certainly shouldn't be allowed to have government officials quash efforts to expose it. Okay, thank you. You will have rebuttal. Should you choose to utilize it, Mr. Husson? Please proceed. Back unmuted there. May I please the court assistance Attorney General Richard Hussack for the state and I urge the court to affirm the circuit courts grant of the Attorney General's motions to voluntarily dismiss this case, key tam action under the False Claims Act because under any relevant legal standard, that dismissal was abundantly justified. I would like to briefly summarize the state's position and then proceed if I may subject to any questions the court has to address the relevant legal standard, the relevant facts, and then the application of the relevant legal standard to those facts. Briefly, this is not a closed case. The motion to dismiss itself before any reply said that the relator's claims suffer from significant legal and factual defects that do not justify the continued expenditure of state resources. That is unquestionably a valid reason for the Attorney General to exercise his constitutional and statutory authority to control a key tam action. There was an elaboration on those reasons in reply. The relator takes issue with the fact that they were not fleshed out in the beginning but as we've laid out in our brief and I don't know that we need to elaborate on here, Illinois law is uniform that there's no burden on the Attorney General to justify dismissal and that's certainly true in the seal period before a complaint has been unsealed. Instead, the burden is upon the relator to show glaring evidence of bad faith or fraud by the Attorney General to justify rejecting a motion to dismiss and that is limited to the most extraordinary circumstances under Illinois law. I have not seen a single Illinois case that has rejected the Attorney General's motion to dismiss a key tam action and the Attorney General's factually solid. Restitution for overtime fraud can be obtained in the criminal case against Thornley. The state can also get restitution of any workers' compensations fraud in Thornley's workers' compensation case and in fact can only do so in that case, cannot do so in a civil action like this key tam case. The relator's reply does not dispute the jurisdiction which links to that by the first and fifth districts. They do not invite this court to reject those holdings. They're well grounded in policy and finally any judgment that might be obtained against Thornley in this key tam action would present doubtful recovery as to any amount because Thornley was already subject to multiple debt collection actions. So the game wasn't really worth the candle in this case and the Attorney General made that clear. Those reasons by the an independently elected constitutional officer are sound. There is nothing to suggest, there are no facts to suggest that those reasons were in bad faith or as a fraud on the court. There is sheer speculation about pressure by the governor and attempt to cover things up. That is only speculation. There's not a shred of evidence to support it. The circuit court held that the governor didn't even know about this case because it's under seal. And so the idea that somehow the Attorney General was part of a massive top level of government corruption scheme makes great for a Hollywood script. And I suppose maybe there's some positions available now in Hollywood with a strike going on, but this is a court of law and the court requires that facts be supported by evidence. And here the documents that Fox was required to submit with her complaint, that the facts that giving them credit in those documents show nothing of the sort. They show nothing about any corruption by the Attorney General, which is the relevant focus of the inquiry. Now, I do want to comment upon the repeated accusations of corruption by the with the complaint, leave aside the allegations of the complaint, show exactly one thing. They show that the person at CMS, which is in charge of defending workers' compensation claims, explained to Fox that he was in consultation with the governor's office and Anne Spillane in the process of defending that claim, which included an initial decision to start paying temporary benefits to Thornley, even though the investigative report had already come out and had poured a ton of cold water on Thornley's veracity. So that sounds a little bit counterintuitive, but it doesn't suggest, as the allegations of the complaint and the allegations in Fox's brief say, that Spillane gave a direct order to CMS to pay Thornley, that she forced them to do so, that there was any bypass of the relevant process of the normal process here, that the claim was submitted directly to Anne Spillane. All of that is outside the facts that have been submitted. They're unsupported by those facts and they're contradicted by those facts. On the accusations about the governor, let's turn to the overtime compensation thing. Nobody knew about it until it was already done, at which point, when it came to the governor's attention, the governor told the state police merit board, which is not under the governor's jurisdiction, recommended that they conduct an independent investigation, which they did. And that investigation essentially presented abundant evidence that Thornley had defrauded the state out of lots of overtime compensation. Thornley said she was going to get the governor to step in if her boss didn't back off, but the governor did exactly the opposite. The governor didn't do any thing. Thornley was threatening all sorts of things, but those threats were never materialized by anybody in the governor's office. I do want to say that even apart from the factual lack of support for these allegations, they're legally beside this point. The elements of Fox's key TAM claims against Thornley do not depend upon anything that anybody in the governor's office may have done. The elements of those claims are fully established by what Thornley did or didn't do. Those allegations don't increase the amount of any judgment against Thornley. None of the individuals in the governor's office is named as a defendant in the key TAM action. They're not seeking any recovery against any of the people in the governor's office. So this winds up being largely a massive distraction, which is great for grabbing headlines, but adds nothing material as a legal matter to her claim and confuses repeatedly something that the governor allegedly did or his wife allegedly did or his general counsel allegedly did with the attorney general's separate decision about whether to pursue this case or not, which was factually and legally unimpeachable. I do want to say one thing briefly, apart from the factual assertions in the plaintiff's briefs or the relator's briefs, which the court has already alluded to, there have been repeated ad hominem attacks against the attorney general's office and against me personally. They are unprofessional, they are offensive, and they are factually baseless. I don't want to say any more about it. This should not be, this should not occur in this court or in any court. But let me turn to the legal standard. The Illinois Supreme, Illinois courts, including the Illinois Supreme Court, have repeatedly held that only in the most extraordinary circumstances would the attorney general's decision to voluntarily dismiss a key TAM action be rejected by the court. Scicchiti, without specifically making a decision on the application of facts in that context, made clear what the constitutional background was. And the court in Burlington Court and the QVC decision, which essentially adopted the Burlington Court's reasoning, both emphasized the constitutional background and said that to overcome the attorney general's decision, there needs to be proof or glaring evidence of fraud or bad faith by the attorney general. In this case, there is, Fox makes no attempt to claim that that standard has been satisfied. Instead, she put her eggs into a different basket and said, let's go with what the federal courts are going to do, apparently hoping that the Supreme Court in the Polanski case would hold that there's a much more lenient standard for overturning an attorney general motion to dismiss a case. But he jumped out of the pan, the frying pan, and into the fire. The U.S. Supreme Court's recent decisions on the Sequoia Orange case says none of this burden-shifting stuff. We're going to say that the standard is the standard for a voluntary dismissal of an action by the plaintiff, in this case where the government is a real party in interest. The cognate provision under Illinois law is 2-1009, which before this positive motion has been filed, gives the plaintiff an unqualified right to dismiss the case. That's where we are now. There was no answer filed. The complaint was not even unsealed. Polanski goes on to say that if the case is unsealed, then the court has some discretion to deny a motion to dismiss, but that discretion should refuse such a motion only in the most extraordinary circumstances. And the court commented that that was not even a close case. The same observations apply here. I want to rebut the suggestion that the One Third same standard for different reasons went on to say that the trial court must assume the truth of the complaint's factual allegations, and that the focus of the inquiry is whether it states a valid claim or not. That's not what the Sopporto case says. And in fact, the cases that opposing counsel read narrowly that did focus on the factual sufficiency of the claims are inconsistent with the case. Turning a motion for voluntary dismissal of a key TAM action into a motion for involuntary dismissal under Section 2619 would also confound the Attorney General's ability to get rid of cases that make no sense to pursue if, in fact, the plaintiff has alleged some facially sufficient claims. And we don't dispute that for the overtime fraud claim, that's a facially sufficient claim. It's just not going to get any additional recovery beyond what can be obtained in the criminal case. And that would be recoverable, giving many problems, financial problems, that Thornley now faces. Let me address, however, the catch-all protection, which is something that the Supreme Court alluded to, but not necessarily. And the Third Circuit's decision in that case elaborated on it, and that's mentioned in footnote four of the Supreme Court's decision. There, the Third Circuit expressed doubt whether a relator's interest in the nature of a conditional assignment of the recovery qualifies as a property right that's protected by due process. And we've submitted in our brief that because there's no statutory protection for it, it does not satisfy the requirements for being a constitutionally protected property right. There is no equal protection claim here, so we don't even need to address that. But even if there were a legally cognizable property interest by a relator of the claim, the standard is that executive action, we're not talking about legislation, executive action to violate substantive due process rights has to shock the conscience. And the number of cases that have found that that standard has been satisfied are exceedingly few. And this case doesn't even come close to meeting that standard. I'd like to, if I may, as time permits, address some of the facts relevant to the major headings of the plaintiff's claim. I do want to say, however, that on page five of their brief, they make the statement that Thornley has obtained more than half a million dollars by defrauding the state. I don't see where that adds up unless they're including the money that Thornley didn't obtain that were spent for the independent investigation. The two major headings of the fraud claim are the overtime fraud, which the relator says amounts to more than $67,000, and the supposed workers' compensation fraud, which they said amounted to tens of thousands of dollars, and then later said might be about $70,000. So we're looking at a mere fraction of the $500,000 that they mentioned. And as to the overtime compensation, I think that the issues are, there's already a case in which that can be recovered, and the likelihood of recovering anything else in a redundant civil action is minimal. I don't know that I need to say anything more about the governor's supposed complicity and corruption at the top levels of government that those make for great speculative headlines. There's not a Thornley. Council, what's the status of the criminal case? I understand that recently there was an order continuing it for additional hearing and trial. I think at the end of this month that I'd be glad to submit a letter to the court if it wants reporting on what the clerk's office shows in Sangamon County in that case. Is that what you're referring to when you say that if she was convicted, then to the extent that money could be recovered, money that she was not entitled to, it would be through the criminal case? Yes, for the overtime fraud. Yes, that's correct. Is that the basis of the criminal charge? Yes, it is. And the indictment is in the record. Okay. I'm not familiar with cases where the person who allegedly defrauded the government has similarly been charged with a criminal offense or the underlying action. Are you familiar with any? I am not, Your Honor. I just know that applying general principles here, a criminal case can result in an order of restitution. And that is handled by the assistance of the state's attorney's appellate prosecutor, I believe. And I would hope that they would seek restitution. It remains to be seen whether for some reason they wouldn't do so, but that seems to me sort of a natural consequence or procedure to follow in that case. Turning to the workers' compensation case, we have said, and there's been no dispute, the KETAM action doesn't have jurisdiction to pursue restitution of the workers' comp claim. Now, the reality is, if anybody's familiar with how workers' comp claims operate, it's not the defendant who controls the schedule, it's the claimant who controls the schedule. And until the claimant submits a request for hearing on the merits, and then the employer says, we want to include as an issue to be tried whether we can recover wrongfully obtained workers' comp benefit, that's how the process works. So the state is essentially waiting until Thornley would ask for a hearing, at which point it'll say, okay, now we want to recover the wrongfully paid temporary benefit. And the reason those benefits were paid temporarily was because if they didn't pay them voluntarily at the beginning as a small amount of insurance protection, and Thornley went to demand an arbitrator's order to require the temporary benefits, then the state would be stuck paying them indefinitely. So a small amount of money enabled it to do something that was prudent, even though it may sort of seem incongruous to pay anything at all in light of all the disclosures in the independent investigation report that undermine Thornley's claim of sexual assault. But that report, again, wasn't evident, much less admissible. And so the state, as the letter that, as the conversation with the CMS person that Fox had disclosed, he said, we need to get an independent medical investigation, and then we will consider stopping those payments, which is what they did. So we have two claims, one of which is redundant to the criminal case, basically, the other of which can't be brought against this court. And both of those claims would lead to potentially a modest recovery that might not be collectible at all in light of other financial problems. I want to address briefly the suggestion for the first time on appeal that the Attorney General has been somehow guilty of bad faith or fraud on the court here. Those are waived. Those weren't made in the circuit court. And there is no basis for them. A disagreement about whether Fox was an original source or not doesn't amount to bad faith or fraud on the court. And I want to say that I will acknowledge that Fox would be deemed an original source for the overtime fraud, but not for the workers' compensation fraud. Her letter to the OEIG says, oh, by the way, you should know the investigation report indicated that Thornley didn't do what she accused her boss of doing. So that was already a public disclosure of that investigation report under the statute. She relied upon that and referenced it in her original claim based on it. That doesn't make her an original source. So she would be an original source only for the overtime fraud claim. If the court's interested in any of the other issues in this case, the standard of review, whether there's any prejudice, reversible error related to the manner that the circuit court followed in terms of how the briefing was handled and who said what when, the interplay of federal precedents and the state constitutional background in terms of how they each interpret the parallel but similar statutes, whether there was a conflict of objection, there was no conflict. I would be glad to address any of those issues. But if the court does not have any further questions, thank you for your time and we urge you to affirm the circuit court's judgment in this case. Thank you. Thank you, counsel. I see no questions. Is there any rebuttal? You have to unmute your microphone, counsel. Understood. Thank you, your honor. I'd urge the court to try to find in the record any reference to the facts that Mr. Huzog just said about Jenny Thornley's financial condition. We're in the record that occurs. It's not there. We're in the record. This detailed analysis of the workers' compensation law was presented to the circuit court. It never was. It's a post hoc attempt to justify it. I will say that the law is very clear that if there is not a current civil money action proceeding, the government action bar does not apply. There wasn't one. They conceded at the hearing that the state was not seeking to claw back any workers' compensation benefits. And in terms of this argument that don't worry, restitution will come in the criminal matter. Not only is it not a civil action, which is what the statute provides, might be a bar, but it only concerns about $10,000 of the $70,000 or $67,000 of overtime fraud identified in the complaint supported. Mr. Huzog says, well, I don't know how they got to $500,000. I just refer the court to the record sites and the facts at pages five through seven where we go through it in detail. It's all right there. And then moving on, the state did not abundantly justify anything in its motion. To say the conclusion in one sentence, it's legally deficient and doesn't justify the resources, doesn't pass muster. And in that regard, I'd refer the court to what did pass muster in Polanski. In Polanski, the court enumerated, explained and gave documentation explaining what the expenses actually were. And the district court in that decision, and the Supreme Court notes this at page six of the slip opinion, did a detailed analysis to see if the government's statements actually were sustainable upon review. The court did review it and did consider it. It wasn't just a conclusion. And this notion that because the state doesn't ultimately have the burden, they say Ms. Fox has the burden, so they don't have to give any reasons in their motion. They can save everything for reply. That is not how litigation works in this or any other state. Plaintiffs always have the burden of proof, but when a defendant makes a motion to dismiss, they have to justify it with reasons in their opening. They can't raise issues only in reply. That is fundamentally unfair, as we did argue in the hearing before Judge Giganti below. Finally, I just want to note that Mr. Hussig said, well, the AG actually doesn't think there is a cognizable property interest. He cited you to the Third Circuit's decision in Polanski, but I'd ask the court to look at the Supreme Court because they very clearly disagree with his position. In footnote four, they say, so what is the court supposed to do at the hearing the FCA requires? The Third Circuit suggested the Rule 41 standards rest atop the foundation of bedrock constitutional constraints on government action. So a hearing, pre or post answer, might inquire into allegations that it violates the relator's rights to due process. Supreme Court knows that she has a and again, the Attorney General tells you, no, you don't actually have to find there is any interest. We question whether it even exists. It does. The other thing that the Supreme Court says in Polanski is that the relator has an interest. And so they say in Polanski that at the hearing, part of the district court's task is to consider the relator's interest in the case. That's at opinion. Here, Judge Giganti felt that he had no role, that he couldn't inquire beyond the surface. And Mr. Huzzock now says, oh, yeah, well, maybe she was an original source. But below, the Attorney General argued absolutely not an original source. He's still arguing she wasn't an original source because of the McGuire-Woods report, ignoring again that she's made counterfactual arguments. That's not an ad hominem attack against Mr. Huzzock. It's just a description of his argument. And that's what it is. So, you know, we think this conduct, this case overall does shock the conscience. And yes, other cases in Illinois have affirmed dismissals over relator's objections, but none involved allegations of bad faith or conflicts of interest, like in this case. In none, was there an allegation of complicity? Is there any allegation of bad faith by the Attorney General or his office? The arguments that we made with regard to the Attorney General's bad faith, I think if you look at the hearing, we objected to the whole way they handled the motion to dismiss. And we continue to maintain that that demonstrates bad faith, Your Honor. Prior to that point, are you claiming any basis for bad faith in the Attorney General's office? Well, we think the bad faith is in making the motion. And prior to that, there wouldn't be any reason to do it. I thank you for your time, Your Honor, and your consideration. Thanks to both of you for your arguments. The case is now submitted and the court will stand in